UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| TIMOTHY AXFORD, SENAA AXFORD, | * | |
| and YUSUF M. AXFORD, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Civil Action No. 19-cv-11540-ADB |
| v. | * | |
| | * | |
| TGM ANDOVER PARK, LLC, | * | |
| | * | |
| Defendant. | * | |
| | * | |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

BURROUGHS, D.J.

Plaintiffs Timothy Axford ("T. Axford"), Senaa Axford ("S. Axford"), and Yusuf M. Axford ("Y. Axford," and collectively with T. Axford and S. Axford, "Plaintiffs") bring this action against TGM Andover Park, LLC ("TGM"), alleging various statutory, tort, and contract claims in connection with their tenancy at Unit 4012 (the "Apartment") in TGM's apartment complex, TGM Andover Park ("Andover Park"), located at 113 Thoreau Way in Lawrence, Massachusetts. See [ECF No. 1-1 ("Compl.")]. Originally filed in state court, TGM removed the action to this Court based on diversity of citizenship. See [ECF No. 1]. Currently before the Court is TGM's motion for judgment on the pleadings. [ECF No. 19]. For the reasons set forth below, TGM's motion is GRANTED in part and DENIED in part.

## I.      BACKGROUND

### A.      Factual Background

"A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss. Because [a Rule 12(c)] motion calls for an assessment of the merits of the case at an

embryonic stage, the court must review the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom."  Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (first alteration in original) (citations and internal quotation marks omitted).  The Court provides the following background consistent with this standard.

TGM's agent, Rebecca Landquist, showed T. Axford and S. Axford the Apartment on or around August 15, 2018.  [Compl. ¶¶ 14–15].  During this showing, Ms. Landquist told them that the Apartment complied with all state and municipal codes and was habitable.  [Id. ¶ 15]. T. Axford signed a lease agreement ("Lease")[1] for the Apartment on August 25, 2018.[2]  [Id. ¶ 16].  At the time, S. Axford was six months pregnant with their son, Y. Axford, who was born on November 16, 2018.  [Id. ¶¶ 18, 25].  Prior to showing Plaintiffs the Apartment, TGM did not have it inspected, as required by the City of Lawrence's Municipal Code, or obtain an occupancy permit as required by law.  [Id. ¶¶ 12–13].

Shortly after T. Axford and S. Axford moved into the Apartment, they began to experience issues, including a rat infestation, problems with the hot water and dryer, and intermittent difficulties with the heat.  [Compl. ¶¶ 20–22, 24].  They promptly notified TGM of these issues, as they arose, pursuant to Andover Park's maintenance procedures.  [Id. ¶¶ 19–22,

---

[1] "In reviewing a motion under Rule 12(c), as in reviewing a Rule 12(b)(6) motion," the Court "may consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'"  Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).  "This is true even when the documents are incorporated into the movant's pleadings."  Id. (citing Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 17 (1st Cir. 1998)).  Plaintiffs referred to the Lease at issue in this action in their complaint, see [Compl. ¶¶ 16, 99–104], and TGM attached it as an exhibit to the instant motion, see [ECF No. 20-1].

[2] S. Axford's name was left off the Lease inadvertently.  [Compl. ¶ 16].

24].  TGM sent the proper professionals to address the issues in most cases, although the dryer remained unrepaired for the duration of Plaintiffs' tenancy.  [Id.]  Regarding the heat, each time Plaintiffs provided notice of a malfunction, TGM informed them that the pipes in Andover Park were old and needed to be replaced, but that TGM would do its best to restore the heat.  [Id. ¶ 22].  Plaintiffs continued to experience sporadic heat issues throughout their tenancy.  [Id.].

In November 2018, the City of Lawrence notified TGM of a broken air release force valve connected to TGM's sewage line, and TGM performed repairs on the broken valve as required under its easement, but did not inspect its other sewage lines.[3]  [Compl. ¶¶ 29–35]. Shortly thereafter, multiple residents of Andover Park began to experience sewage backup issues, and TGM sent a local pumping company to pump Andover Park's sewage lines.  [Id. ¶¶ 36–37].

The morning of December 9, 2018, both toilets in the Apartment began to overflow, resulting in raw human sewage flooding the Apartment.  [Compl. ¶ 41].  The previous day, TGM had informed all Andover Park residents via email that the main office's phone lines were down, provided an emergency phone number, and said that the main office would open at noon on December 9.  [Id. ¶ 40].  Plaintiffs left multiple messages on the emergency line, but after receiving no response, went to the main office to wait for it to open.  [Id. ¶ 43–46].  Despite announcing a noon opening, Ms. Landquist did not arrive until 12:30 PM and, Shawn Moury, the head of maintenance, did not arrive until 1:00 PM.  [Id. ¶¶ 46–48].  Mr. Moury instructed Plaintiffs to immediately evacuate the Apartment and take as many of their belongings with them

---

[3] TGM owns and maintains sewage lines within Andover Park, and maintains sewage pipes outside the park through a sewage easement.  [Compl. ¶¶ 26–28].  As an assign to the easement, TGM is responsible for maintaining and repairing the sewers, manholes, inlet structures, and appurtenant facilities covered by the easement.  [Id. ¶ 28].

as possible.  [Id. ¶ 49].  Plaintiffs did so, going to a relative's apartment, also located in Andover

Park, while TGM's agents began attempting to diagnose and fix the problem.  [Id. ¶ 50]; see also

id. ¶ 52].  That same day, Mr. Moury discovered a broken sewage pipe approximately 100–200

feet from the Apartment.  [Id.].

    In the days following the flood and evacuation, Ms. Landquist informed Plaintiffs that

TGM could provide a fully furnished apartment (at Plaintiffs' expense) provided that Plaintiffs

signed a release of all claims against TGM, but Plaintiffs refused.  [Compl. ¶ 60].  On December

18, 2018, Plaintiffs returned to the Apartment with Ms. Landquist to retrieve their clothing.  [Id.

¶ 68].  Plaintiffs told Ms. Landquist that they were "very distressed" by the situation and told her

that being displaced from their home and losing their belongings was having an "extreme

impact" on them, particularly given that Y. Axford was a newborn.  [Id. ¶ 69].  Ms. Landquist

responded that TGM would pay for the cost of dry-cleaning Plaintiffs' clothing.  [Id. ¶ 70].  The

first two dry-cleaning bills came to a total of approximately $4,200, which TGM initially refused

to pay, thereby preventing Plaintiffs from picking up their clothes.  [Id. ¶¶ 70–72].  Eventually,

TGM paid for the first bill which totaled approximately $1,500, but refused to pay for the

remainder; Ms. Landquist stated that she did not anticipate that the bill would be so high.[4]  [Id.

¶ 72].

    On January 2, 2019, Ms. Landquist informed Plaintiffs that they could safely return to the

Apartment.  Upon their return, Plaintiffs discovered that nearly all the floors, walls, and fixtures

had been removed and that their remaining belongings were in piles and still contaminated with

---

[4] Ultimately, TGM did pay for the second batch of clothing, but at the time Plaintiffs filed their
complaint, there was a third batch at the dry cleaners that they were unable to have cleaned
because TGM refused to provide additional money.  [Compl. ¶¶ 72, 88].

sewage. [Compl. ¶¶ 73, 75, 77].  Further, items of value (including a green card, designer items, and floor rugs) were missing, damaged, or had been disposed of without Plaintiffs' consent.  [Id. ¶¶ 78, 80].

On January 22, 2019, Plaintiffs and TGM agreed to a deal whereby Plaintiffs would sign a new lease (that did not include a release of claims against TGM) for an apartment that would come fully furnished for three months.  [Compl. ¶ 92].  Due to their inability to recover financially after losing all their belongings in the sewage flood, Plaintiffs were late making payments for the first two months of their new lease, and they were unable to procure new furniture once the three-month fully furnished period ended. [Id. ¶¶ 95, 97].  Ultimately, Plaintiffs moved out of the new apartment in April 2019, after giving notice to TGM.  [Id. ¶ 97].

### B.    Procedural Background

The Plaintiffs filed their state court complaint in the Northeast Housing Court in Lawrence, Massachusetts on June 13, 2019.  See [Compl.].  On July 12, 2019, TGM removed the action to this Court based on diversity of citizenship, pursuant to 28 U.S.C. §§ 1332 and 1441. [ECF No. 1 at 1].  TGM subsequently filed its answer together with affirmative defenses and counterclaims, on July 19, 2019.[5]  [ECF No. 4].  Plaintiffs answered TGM's counterclaims on August 9, 2019.  [ECF No. 7].  On May 18, 2020, TGM filed the instant motion for judgment on the pleadings under Fed. R. Civ. P. 12(c).  [ECF No. 19].  Plaintiffs opposed, [ECF No. 23], TGM replied, [ECF No. 26], and Plaintiffs filed a sur-reply, [ECF No. 29].

---

[5] None of TGM's counterclaims are at issue in the instant motion.

## II.   LEGAL STANDARD

"A Rule 12(c) motion for judgment on the pleadings 'is treated much like a Rule 12(b)(6) motion to dismiss.'" Santiago v. Bloise, 741 F. Supp. 2d 357, 360 (D. Mass. 2010) (quoting Perez-Acevedo, 520 F.3d at 29).  Although a defendant may have "moved for judgment on the pleadings pursuant to Rule 12(c) . . . , it is well established that the Court may apply to said rule the applicable standard of review of a Rule 12(b)(6) motion to dismiss." Ramirez-Averasturi v. Rivera Gonzalez, No. 03-cv-02360, 2005 WL 2178795, at *2 (D.P.R. Sept. 8, 2005); see Oses v. Vose, No. 90-cv-11642, 1994 WL 500663, at *2 (D. Mass. Aug. 9, 1994) ("Although defendant's motion is couched as a motion for judgment on the pleadings under Fed. Rule Civ. P. 12(c), in essence the [m]otion challenges the legal foundation for the complaint.  The motion is therefore subject to the same standard of review as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).").  "Like Rule 12(b)(6), Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006) (citing Rivera-Gomez v. De Castro, 843 F.2d 631, 635 (1st Cir. 1988)). "[T]he court may not grant a defendant's Rule 12(c) motion 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Rivera-Gomez, 843 F.2d at 635 (quoting George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553 (2d Cir. 1977)).

"[T]o survive a Rule 12(b)(6) motion (and, by extension, a Rule 12(c) motion) a complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true . . . .'" Perez-Acevedo, 520

F.3d at 29 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Twombly, 550 U.S. at 555, and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible . . . ."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Secondly, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).

Federal Rule of Civil Procedure 9(b)'s special pleading requirements apply to Plaintiffs' fraud-based claims.  See Extreme Reach, Inc. v. Media, No. 14-cv-14725, 2015 WL 4601224, at *1 (D. Mass. July 31, 2015).  Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  One of the primary purposes of Rule 9(b)'s particularity requirement is to "place the defendants on notice and enable them to prepare meaningful responses."  New Eng. Data Servs., Inc. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987).  In the First Circuit, plaintiffs are required to set out "the who, what, where, and when of the allegedly false or fraudulent representation," Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004), and "identify[] the basis for inferring scienter," Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd., 419 F. Supp. 3d 176, 189 (D. Mass. 2019) (quoting N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009)).

## III.  DISCUSSION

Plaintiffs' twenty-count complaint includes claims for violations of various Massachusetts statutes and regulations governing landlord-tenant relationships as well as tort and contract claims.[6]  See [Compl.].  TGM did not move for judgment on four counts: (1) Count II: Breach of Implied Contract; (2) Count IV: Negligent Bailment; (3) Count VII: Conversion; and (4) Count VIII: Trespass to Chattels, [ECF No. 20 at 2], and Plaintiffs stipulated to the dismissal of four others: (1) Count XII: Unjust Enrichment; (2) Count XIII: Private Nuisance; (3) Count XX: Violation of the Lawrence Municipal Codes; and (4) Count XXI: Negligent

---

[6] The Court notes that the complaint inadvertently skipped Count XVII.  Therefore, as noted by Plaintiffs, [ECF No. 23 at 1], the Complaint reaches Count XXI, but there are only twenty counts.

Misrepresentation, [ECF No. 23 at 1].  Accordingly, the Court will consider the twelve claims implicated by the instant motion.

### A.    Count I: Breach of Contract

Plaintiffs allege that TGM breached the Lease by, among other things, "fail[ing] to inspect, fix and maintain the [Apartment] continuously to a standard that was safe, habitable and fit for habitation."  [Compl. ¶ 102].  TGM argues that Plaintiffs have not pleaded facts that constitute a breach of any enforceable term of the Lease.  [ECF No. 20 at 13].

"[T]o state a viable breach of contract claim under Massachusetts law, plaintiffs must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiffs sustained damages as a result of the breach."  Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007).[7]  Although the general rule is that plaintiffs must point to specific contractual obligations that were allegedly breached, see Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996), the First Circuit has encouraged courts to allow breach of contract claims to survive motions to dismiss if the factual allegations support a potential claim, notwithstanding an untidy or imperfect pleading, Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 233 (1st Cir. 2013) ("Although [the breach of contract claim] is pled in a muddled fashion, [it] incorporates [the] factual allegations by reference and states that defendants breached their duty to abide by the contract's terms.").  Here, Plaintiffs' breach of contract claim is pleaded in a "muddled fashion."  Id.  Plaintiffs do not cite any specific provisions of the Lease in their complaint but their factual allegations, taken in conjunction with the Lease itself, make out a claim for breach of contract that is sturdy enough to withstand TGM's motion for judgment on the pleadings.

---

[7] That the Lease is a valid, enforceable contract is undisputed.

Clause 28 of the Lease obligates TGM to "act with customary diligence" to "comply with applicable federal, state, and local law regarding safety, sanitation, and fair housing." [ECF No. 20-1 at 5].  Under the State Sanitary Code ("SSC"), landlords are required to ensure that all dwellings that they lease to others comply with the SSC's requirements.  105 Mass. Code Regs. § 410.010(A).  Among other things, the SSC requires landlords to provide a toilet and maintain a sewage disposal system "in operable condition."  105 Mass. Code. Regs § 410.750(F).

Plaintiffs allege facts indicating that TGM did not act with customary diligence to properly maintain its sewage lines, leading to the sewage overflow in the Apartment and resulting damage to Plaintiffs' personal property.  For instance, Plaintiffs allege that TGM failed to inspect its sewage lines after repairing a major component that controlled the pressurization of said sewage lines "to ensure that there were no further issues." [Compl. ¶¶ 33–35].  They also claim that within a week after the repair, other residents experienced sewage backups.  [Id. ¶¶ 36–38].  Further, they allege that, approximately two and a half weeks after the initial repair, the sewage overflow occurred in the Apartment and TGM's head of maintenance discovered a broken sewage pipe approximately 100–200 feet from Plaintiffs' apartment.  [Id. ¶¶ 41, 52].  Although TGM disputes that its conduct constitutes a breach of the Lease, Plaintiffs' factual claims meet the plausibility threshold required to survive TGM's motion.  See Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); Young, 717 F.3d at 235–36 (permitting breach of contract claim to survive motion to dismiss where contract could plausibly be read in plaintiff's favor and the allegations in the complaint suggested a breach).  In sum, the Lease can "plausibly be read in [Plaintiffs'] favor," and the complaint's allegations state a plausible claim that TGM breached its terms.  See Young, 717

10

F.3d at 235.[8]  Therefore, TGM's motion for judgment on the pleadings as to Count I, [ECF No. 19], is <u>DENIED</u>.

### B.   Counts XV and XVI: Implied Warranty of Habitability and Covenant of Quiet Enjoyment

Plaintiffs allege that TGM breached both the implied warranty of habitability (Count XV) and the covenant of quiet use and enjoyment (Count XVI) by leasing the Apartment to Plaintiffs with "knowledge of ongoing conditions [in the Apartment] that [could] endanger or impair the[ir] health, safety, or well-being," pointing specifically to the rat infestation, lack of hot water, intermittent problems with the heat, and the allegedly negligent maintenance of the sewage system and resulting flood.  <u>See</u> [Compl. ¶¶ 171–76, 178–79].  TGM argues that because the various problems with the apartment were addressed quickly and because Plaintiffs evacuated permanently after the flood and therefore never "had to endure uninhabitable conditions for more than a few hours," Plaintiffs have failed to state a claim.  <u>See</u> [ECF No. 20 at 8–9].  The analyses of the implied warranty of habitability and the covenant of quiet use and enjoyment are similar and often intertwined, but they are not identical.  The Court will therefore discuss them separately.

#### 1.   <u>Implied Warranty of Habitability</u>

Under Massachusetts law, every lease contract contains an implied warranty of habitability that imposes a duty of strict liability upon the landlord to deliver and maintain the premises in a habitable condition.  <u>See</u> <u>Bos. Hous. Auth. v. Hemingway</u>, 293 N.E.2d 831, 843 (Mass. 1973) (defining warranty); <u>Berman & Sons, Inc. v. Jefferson</u>, 396 N.E.2d 981, 984 (Mass.

---

[8] The Court need not reach the parties' arguments about other clauses of the Lease because it finds that Plaintiffs have stated a plausible claim to relief for breach of Clause 28.

1979) (clarifying that the landlord's duty is one of strict liability).  Trial courts have wide

discretion in assessing whether a breach occurred, <u>McKenna v. Begin</u>, 362 N.E.2d 548, 551

(Mass. App. Ct. 1977), with the assessment depending on the facts of each case, <u>Hemingway</u>,

293 N.E.2d at 843.  "The emphasis is on whether the premises are fit for human habitation."

<u>Goreham v. Martins</u>, 147 N.E.3d 478, 488 (Mass. 2020).  Thus, although conditions that

"endanger or materially impair the health or safety and wellbeing of an occupant" as enumerated

in the SSC are generally substantial enough to violate the warranty, <u>Altschuler v. Bos. Rent Bd.</u>,

425 N.E.2d 781, 785 (Mass. App. Ct. 1981), isolated or minor code violations may not be

sufficient to constitute a breach, <u>McKenna</u>, 362 N.E.2d at 551.

The SSC provisions discussed above provide that failure to maintain a sewage disposal

system is a condition "which may endanger or materially impair the health or safety and

wellbeing of an occupant."[9]  105 Mass. Code Regs. §§ 410.020, 410.750(F).  The same factual

allegations suggesting that TGM failed to act with customary diligence to comply with the SSC,

<u>see</u> <u>supra</u>, Section III.A., also suggest that TGM failed to actually comply with the SSC.  For this

---

[9] Along with the sewage flood, Plaintiffs point to the alleged rat infestation, inadequate hot
water, and sporadic heat issues to support their claim that TGM breached the warranty of
habitability.  [Compl. ¶¶ 171–73].  It is not necessary to undertake a full analysis of these
allegations because the Court finds that the allegations regarding the sewage system are
sufficient to withstand TGM's motion.  The Court notes, however, that these other alleged
defects, while perhaps not severe enough to constitute breaches when considered in isolation,
may be relevant in a totality-of-the-circumstances inquiry.  <u>See</u> <u>McKenna</u>, 362 N.E.2d at 551
("[I]solated violations [of the SSC] may be found not to constitute a breach of the warranty of
habitability . . .  On the other hand, there may be instances in which minor violations in
conjunction with major violations or a multitude of minor violations . . . should be taken into
consideration.").

reason, Plaintiffs have also plausibly pleaded a breach of the implied warranty of habitability.[10]

Accordingly, Plaintiffs TGM's motion, [ECF No. 19], is <u>DENIED</u> as to Count XV.

2.   <u>Covenant of Quiet Enjoyment</u>

The covenant of quiet enjoyment forbids a landlord from "directly or indirectly interfer[ing] with the quiet enjoyment of any residential premises by the occupant" or failing to provide essential services such as hot water, heat, and electricity.  <u>See</u> Mass. Gen. Laws ch. 186, § 14.  Unlike the implied warranty of habitability, the covenant of quiet use and enjoyment does not impose strict liability on the landlord.  Instead, the tenant must "demonstrate that the landlords' negligence caused serious interference with his tenancy by acts or omissions that impair[ed] the character and value of the leased premises."  <u>Goreham</u>, 147 N.E.3d at 491 (citations and internal quotation marks omitted).  Generally, the landlord must have been provided notice of the defective condition(s) and acted negligently in failing to rectify them.  <u>See</u> <u>Jablonski v. Casey</u>, 835 N.E.2d 615, 619–20 (Mass. App. Ct. 2005) (finding no violation because the landlord immediately repaired the defects and had a reinspection done less than two weeks later to ensure all conditions had been adequately addressed); <u>see also</u> <u>Cruz Mgmt. Co. v.</u>

---

[10] TGM argues that Plaintiffs failed to state a claim because they "simply never had to endure uninhabitable conditions for more than a few hours until the TGM representative came on site, and certainly not during some unreasonable period of repair."  [ECF No. 20 at 8].  It also appears to argue that, as a matter of law, when the tenant vacates the apartment there can be no breach of the warranty of habitability.  <u>See</u> [<u>id.</u>].  These arguments are unavailing.  <u>Hemingway</u> makes clear that the analysis is a fact-based one, and provides *factors* to assess the materiality of a breach, including the length of time the defects persist, whether the defect can be repaired in a reasonable amount of time, and the defects' overall effect on habitability.  293 N.E.2d at 843–44.  Therefore, while all circumstances must be considered in assessing whether a breach occurred in the instant case, the circumstances cited by TGM do not defeat Plaintiffs' claim as a matter of law.

Thomas, 633 N.E.2d 390, 395 (Mass. 1994) ("A landlord's failure to repair defects of which he has notice in leased premises is an omission which frequently has been deemed to violate § 14.").

Here, Plaintiffs have pleaded facts regarding defects in the Apartment that they allege TGM did not adequately address, including malfunctioning heat and negligent maintenance of the sewage system that led to the Apartment's sewage flood.  See [Compl. ¶¶ 22, 33–39, 41]. Regarding the heat, which is the focus of the parties' arguments regarding the covenant of quiet enjoyment, Plaintiffs allege that TGM knew of an underlying problem with Andover Park's pipes and did not rectify it, instead merely fixing each individual disruption to the heat in the Apartment, resulting in intermittent heat issues throughout Plaintiffs' tenancy.[11]  [Id. ¶ 22].  As to the sewage overflow, Plaintiffs allege that TGM had notice of a defect in the sewage system because the City of Lawrence, during an unrelated inspection, informed TGM that a crucial component was broken and in need of immediate repair.  [Id. ¶¶ 33–35].  They further allege that after TGM completed that repair, it failed to inspect the rest of its sewage lines to ensure that there were no further problems, [id. ¶ 35], and that residents soon began experiencing sewage backups, ultimately culminating in the flood of the Apartment.  [Id. ¶¶ 36–39, 41].

In sum, knowingly renting premises in a defective condition and failing to correct that condition is a valid basis to find a breach of the covenant of quiet use and enjoyment. See, e.g., Jablonski v. Clemons, 803 N.E.2d 730, 733 (Mass. App. Ct. 2004).  Plaintiffs have plausibly

---

[11] This case is factually distinguishable from Jablonski v. Casey.  There, there was no violation of the covenant of quiet use and enjoyment because the defendant landlord immediately repaired the defect and also conducted a reinspection of the premises less than two weeks after repairing the defects to ensure that the issues had been adequately addressed.  Casey, 835 N.E.2d at 619–20.  Here, Plaintiffs allege that TGM essentially did the opposite by failing to correct underlying issues to avoid further problems.  See [Compl. ¶¶ 22].

pleaded that TGM was aware of "interfering condition[s]," namely malfunctioning heat and sewage systems, and "fail[ed] to rectify [them]." Baker v. Equity Residential Mgmt., L.L.C., 390 F. Supp. 3d 246, 257 (D. Mass. 2019) (construing Massachusetts state law).[12]  Whether TGM's conduct was sufficiently negligent under § 14 for Plaintiffs to recover damages is a matter that will eventually be resolved by a factfinder, but Plaintiffs' allegations meet the plausibility threshold for present purposes.[13]  TGM's motion as to Count XVI, [ECF No. 19], is therefore DENIED.

### C.    Counts XIV, XVIII, and XIX: Chapter 93A

Plaintiffs allege violations of Massachusetts General Laws Chapter 93A under several theories.[14]  In Count XIV, Plaintiffs allege that TGM violated the statute itself.  [Compl.

---

[12] TGM argues that Count XVI must be dismissed because it is "merely a recital of the elements of breach of the covenant of quiet enjoyment and are [sic] therefore as a matter of law inadequate." [ECF No. 20 at 9].  Plaintiffs, however, incorporate all factual allegations by reference into Count XVI and explicitly refer to TGM's conduct "as enumerated in [the] Complaint." [Compl. ¶¶ 177, 179].  Reading Plaintiffs' complaint as a whole as the Court must, Hernandez-Cuevas, 723 F.3d at 103, the factual allegations incorporated by reference in Count XVI are adequate and do not, as TGM claims, require the Court to "ferret[ ] out" plausible allegations, [ECF No. 20 at 9].  See Grajales, 682 F.3d at 44 ("A determination of plausibility . . . requires the reviewing court to draw on its judicial experience and common sense." (internal quotation marks and citation omitted)).

[13] While Plaintiffs did not specifically plead impaired value of their apartment, see Goreham, 147 N.E.3d at 491, the Court must draw reasonable inferences in their favor based on the factual allegations in the complaint.  See supra, Section II (outlining the legal standard for Rule 12(c) motions, including the requirement to draw reasonable inferences in the nonmovant's favor).  It is reasonable, perhaps more than reasonable, to infer that a flood of raw human sewage into an apartment would impair its value.  Further, "[i]t [is] wholly foreseeable (in fact, it [is] inevitable) that the failure adequately to correct [numerous code violations] . . . would impair substantially the value of the leased premises. . . ." Cruz Mgmt. Co., 633 N.E.2d at 395.

[14] Chapter 93A generally applies in the landlord-tenant context, a fact which TGM does not contest.  By the express language of the statute, the scope of trade and commerce it covers includes "the offering for sale, rent or lease . . . of . . . any property."  Mass. Gen. Laws ch. 93A, § 1(b); see also McGrath v. Mishara, 434 N.E.2d 1215, 1221 (Mass. 1982) ("The protection of c.

15

¶¶ 166–68].  In Counts XVIII and XIX, Plaintiffs allege that TGM violated Chapter 93A under

the general implementing regulations and the regulations aimed specifically at the

landlord-tenant relationship, respectively.  [Id. ¶¶ 181–84, 186–88].   The Court will consider

each theory in turn.

        1.    General Chapter 93A Claim

In Count XIV, Plaintiffs allege that TGM engaged in unfair and deceptive practices

proscribed by Chapter 93A, § 2.  See [Compl. ¶ 167].  TGM responds that a Chapter 93A claim

must fail when it is "based on the same facts as failed claims for breach of the warranties of

habitability and of quiet enjoyment."  [ECF No. 20 at 10].  Thus, in its view, since Plaintiffs

failed to state a claim for the latter, they have also failed to state a claim for the former.[15]   [Id.].

This argument fails as the Court has already found here that Plaintiffs have, in fact, stated a

plausible claim for both a breach of the warranty of habitability and the covenant of quiet

enjoyment.  See supra, Section III.B.  Because a violation of the warranty of habitability or the

covenant of quiet enjoyment is sufficient to support a Chapter 93A claim, the fact that Plaintiffs

have adequately stated a claim for the former, means that they have also adequately stated a

claim for the latter.  See Baker, 390 F. Supp. 3d at 259 ("[A] substantial and material breach of

the implied warranty of habitability constitutes a violation of Chapter 93A, as does a breach of

_____

93A clearly extends to lessors of real property, and thus to the landlord-tenant relationship."); Ablondi v. Chase, 414 N.E.2d 617, 617–18 (Mass. App. Ct. 1981) (discussing a Chapter 93A claim in the landlord-tenant context and stating that "the landlord-tenant relationship is not beyond the reach of consumer law").

[15] TGM also asserts various other arguments to rebut Plaintiffs' Chapter 93A theories.  See [ECF No. 20 at 10–11].  Because the Court finds that Plaintiffs have stated a plausible claim for a Chapter 93A violation based on breaches of the warranty of habitability and covenant of quiet enjoyment, it need not reach those additional arguments.

the implied covenant of quiet enjoyment." (internal quotation marks and citations omitted)).

TGM's motion as to Count XIV, [ECF No. 19], is therefore <u>DENIED</u>.

        2.     <u>Chapter 93A Regulations</u>

Plaintiffs also allege Chapter 93A violations under two sets of implementing regulations:

the general regulations in 940 C.M.R. § 3.16 and the landlord-tenant specific regulations in 940

C.M.R. § 3.17. [Compl. ¶¶ 181–88]. TGM argues that the more specific landlord-tenant

regulations under § 3.17 supersede these general regulations, thus barring Plaintiffs' § 3.16

claim. [ECF No. 20 at 18].

        a.     § 3.17 Supersedes § 3.16

The Supreme Judicial Court ("SJC") has not yet reached the precise question of whether

§ 3.17 supersedes § 3.16 in the landlord-tenant context. <u>See</u> <u>Underwood v. Risman</u>, 605 N.E.2d

832, 837 (Mass. 1993) (specifically reserving the "question whether the more general regulation

has any viability in view of the later adopted, more specific, provisions of [§ 3.17]"). TGM

acknowledges that the question has not yet been resolved, <u>see</u> [ECF No. 20 at 18], but argues that

"[t]he SJC has long held that were [sic] there is a later enactment which 'applies specifically to

unfairness in one industry' versus the earlier 'general application' of 93A, 'the provisions of the

specific statute must govern.'"  [<u>Id.</u> (quoting <u>Reiter Oldsmobile, Inc. v. Gen. Motors Corp.</u>, 393

N.E.2d 376, 378 (Mass. 1979)]. It further argues that this logic should apply with equal force in

the regulatory context. [<u>Id.</u>]. TGM is correct. As Judge Sorokin recently explained, it is

> [a] well-established canon of statutory interpretation . . . that, if a general statute
> and a specific statute cannot be reconciled, the general statute must yield to the
> specific statute. This is particularly true if the specific statute was enacted after the
> more general statute. These principles apply equally to interpretation of regulations
> and other laws.

Alenci v. Hometown Am. Mgmt., LLC, No. 19-cv-12244, 2020 WL 2515872, at *4 (D. Mass. May 15, 2020) (citations and internal quotation marks omitted).  There, the court considered whether the Massachusetts Manufactured Housing Act's ("MHA") implementing regulations superseded the SSC in the manufactured housing community context.  Id. at *2–3.  The court ultimately concluded that the universal, general obligations under the SSC were superseded by the equivalent, but more narrowly tailored, obligations under the MHA regulations.  Id. at *3. Similar to Alenci, most of the general provisions cited by Plaintiffs under § 3.16 have an equivalent under § 3.17 that is more narrowly tailored to landlord-tenant relationships.[16]

Compare, e.g., 940 Mass. Code Regs. § 3.16(3) (defining "fail[ure] to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide consumer[] . . . protection" as a violation of Chapter 93A), with 940 Mass. Code Regs. § 3.17(1)(i) (defining "fail[ure] to comply with the *State Sanitary Code* or any other law

---

[16] The only exception is Plaintiffs' allegation that TGM's offer of a new lease in exchange for a waiver of liability for the sewage flood was an unconscionable contract term.  See [Compl. ¶ 181].  Plaintiffs do not cite a specific regulatory provision, but they appear to allege that this proffered lease term was a violation of § 3.16(1), which denotes that an act or practice is a violation of Chapter 93A if "[i]t is oppressive or otherwise unconscionable in any respect."  940 Mass. Code Regs. § 3.16(1).  Because there is no equivalent provision in § 3.17, there would be room to argue under Alenci that in this particular circumstance, § 3.17 should not supersede § 3.16.  However, there is no need to reach that question here.  Even assuming *arguendo* the waiver of liability was unconscionable under the meaning of § 3.16, Plaintiffs' claim cannot stand as a matter of law.  By their own admission, Plaintiffs refused to sign the lease containing the allegedly unconscionable term.  [Compl. ¶ 60].  Under basic tenets of contract law, Plaintiffs cannot have suffered harm by unconscionable terms in an agreement that never existed.  See Zapatha v. Dairy Mart, Inc., 408 N.E.2d 1370, 1375 (Mass. 1980) (stating that the issue of unconscionability is a question of law, "and the test is to be made as of the time the contract was made").  If, in the alternative, Plaintiffs are attempting to argue that the mere proposal of this purportedly unconscionable contract term violated § 3.16, this claim also fails as a matter of law for the same core reason: Plaintiffs have failed to plead any injury arising from this conduct.  See [Compl.].

*applicable to the condition of a dwelling unit* within a reasonable time after notice" (emphasis added)).  Although both § 3.16 and § 3.17 impose the same obligation to comply with public health and safety laws aimed at protecting consumers, the more narrowly tailored § 3.17 regulations, which post-date the general § 3.16 regulations, control here.

> b.      Plaintiff's § 3.17 Claim is Adequately Plead

In support of their § 3.17 claim, Plaintiffs assert that TGM failed to comply with the SSC after notice of a violation.  [Compl. ¶ 188].  Reading the complaint as a whole, the Court construes this paragraph to allege that the violation flows, at least in part, from TGM's purported failure to adequately maintain the sewage system.

Massachusetts courts have held that when the theory of liability under the warranty of habitability is premised on the same facts as the theory of liability under Chapter 93A regulations, a violation of the former constitutes a violation of the latter.  See Clark v. Leisure Woods Estates, Inc., 45 N.E.3d 908, 915 (Mass. App. Ct. 2016).  In Clark, the same conduct that violated the warranty of habitability also violated the MHA's implementing regulations, and failure to comply with those regulations amounted to a Chapter 93A violation under the implementing regulations applicable to manufactured housing communities.  Id.  Likewise, here, the same facts (namely, the alleged improper maintenance of the sewage system and subsequent flood) that make out a claim for violations of the warranty of habitability and the covenant of quiet use and enjoyment, see supra, Section III.B, also make out a claim for a violation of the SSC, see supra Section III.A.  Failure to comply with the SSC amounts to a violation of Chapter 93A under the 93A regulations applicable to landlord-tenant relationships.  See 940 Mass. Code

Regs. § 3.17(1)(i).[17]   Therefore, Plaintiffs have stated a claim for a violation of Chapter 93A under § 3.17.

Because the regulations under § 3.17 control Plaintiffs' claim and because Plaintiffs have stated a plausible claim that TGM violated Chapter 93A under § 3.17, TGM's motion, [ECF No. 19], is <u>GRANTED</u> as to Count XVIII and <u>DENIED</u> as to Count XIX.

### D.   Counts X and XI: Misrepresentation and Fraud

In Counts X and XI, Plaintiffs allege that TGM's statements about the Apartment constitute actionable misrepresentation and fraud.  [Compl. ¶¶ 144–54].  TGM maintains that Plaintiffs' allegations do not comport with Rule 9(b)'s pleading requirements and, further, are barred by the Lease, which states that Plaintiffs inspected the Apartment and found it to be free from defects and contains an integration clause.  [ECF No. 20 at 13–14].

First, Plaintiffs' allegations are specific enough to pass muster under the heightened pleading standard, which applies to all of their fraud-based claims.  Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); <u>see</u> <u>Cardinale</u>, 567 F.3d at 15 (applying Rule 9(b) "expansively to cover associated claims where the core allegations effectively charge fraud").  In the First Circuit, plaintiffs are required to set out "the who, what, where, and when of the

---

[17] The parties' briefs focus on whether Plaintiffs adequately pleaded the distinct harm required under Chapter 93A.  <u>See</u> [ECF Nos. 20, 23, 26, 29].  It is true that "a regulatory violation per se does not create an injury for chapter 93A purposes; rather, the violation 'must cause the consumer some kind of separate, identifiable harm arising from the violation itself.'"  <u>Conley v. Roseland Residential Trust</u>, 442 F. Supp. 3d 443, 457 (D. Mass. 2020) (quoting <u>Tyler v. Michaels Stores, Inc.</u>, 984 N.E.2d 737, 745 (Mass. 2013)).  However, because the Court has found that Plaintiffs have stated a plausible claim for a violation of § 3.17 by way of the sewage system malfunction and subsequent flood, these arguments need not be addressed at length.  As already discussed above, it is a reasonable inference that a sewage flood would impair the value of the premises.  Thus, Plaintiffs have adequately alleged a separate and distinct injury.

allegedly false or fraudulent representation," <u>Alt. Sys. Concepts, Inc.</u>, 374 F.3d at 29 (1st Cir. 2004), and "identify[] the basis for inferring scienter," <u>Sterling Suffolk Racecourse, LLC</u>, 419 F. Supp. 3d at 189 (quoting <u>Cardinale</u>, 567 F.3d at 13).  Here, Plaintiffs' allegations set out the who (Ms. Landquist), the what (the representation that the Apartment complied with all State and municipal codes and was habitable), the where (at the Apartment), and the when (on or about August 15, 2018).  [Compl. ¶¶ 14–15].  Further, given Plaintiffs' allegations that TGM had not gotten the apartment inspected or obtained an occupancy certificate [<u>id.</u> ¶¶ 12–13], there is a plausible basis for inferring scienter.  Plaintiffs have therefore done enough to put TGM on notice and enable it to prepare a meaningful response.  <u>See</u> <u>New Eng. Data Servs.</u>, 828 F.2d at 289.

Second, the language in the Lease cited by TGM including the "free of any defects" language and the integration clause, does not, at this stage of the litigation, bar Plaintiffs' claims. The general rule is that if a contract was "fully negotiated and voluntarily signed, [then] plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue." <u>Starr v. Fordham</u>, 648 N.E.2d 1261, 1268 (Mass. 1995) (quoting <u>Turner v. Johnson & Johnson</u>, 809 F.2d 90, 97 (1st Cir. 1986)).  Here, the Lease appears to be a form contract and there is no factual record regarding whether it was negotiated or not.  <u>Contra</u> <u>Realty Fin. Holdings, LLC v. KS Shiraz Manager, LLC</u>, 18 N.E.3d 350, 356 (Mass. App. Ct. 2014) (finding integration clause dispositive where "sophisticated business people, represented by counsel, have negotiated and executed a complex written document touching on all significant aspects of their transaction").  The case upon which TGM relies, <u>Masingill v. EMC Corp.</u>, is distinguishable in that it was decided following a jury verdict and the court specifically discussed the factual circumstances surrounding the negotiation of the

21

written contract before finding that the integration clause barred a fraud claim premised on an inconsistent oral representation.  870 N.E.2d 81, 88–90 (Mass. 2007).

Additionally, the Court notes that the Lease language regarding defects, "[Plaintiffs] have inspected the apartment, fixtures, and furniture and agree that they are free of any defects," [ECF No. 20-1 at 4], is not necessarily directly at odds with Ms. Landquist's statement that the Apartment complied with all relevant codes, [Compl. ¶ 15].  In other words, while the Lease language contemplates physical defects that could be spotted upon visual inspection, Ms. Landquist's alleged representation speaks to compliance with all the requirements of the relevant building codes, which could include requirements involving aspects of the Apartment not subject to visual inspection (e.g., pipes, electrical wiring, etc.).  See Starr, 648 N.E.2d at 1268 (affirming trial court's decision that reliance on prior representation was reasonable where the integrated contract "did not contradict" and was not "clearly at variance" with the representation).  For these reasons, the Court will not dismiss Plaintiffs' fraud claims based on the Lease language alone at this juncture.

Accordingly, TGM's motion for judgment on the pleadings as to Counts X and XI, [ECF No. 19], is DENIED.

### E.    Count III: Negligence

In Count III, Plaintiffs assert a negligence claim, alleging that TGM breached its duty to provide an apartment that comported with applicable safety statutes and regulations.  [Compl. ¶¶ 111–12].  They further allege that the breach ultimately caused the "catastrophic flooding" of their apartment and resulting damages.  [Id. ¶¶ 113–14].  TGM argues that Plaintiffs have failed to properly plead a claim for common law negligence.  See [ECF No. 20 at 24–26; ECF No. 26 at 11–13].

22

To state a negligence claim, Plaintiffs must allege: (1) that TGM owed them a duty; (2) that TGM breached that duty; (3) a causal connection between the breach and the Plaintiffs' damages; and (4) the existence of said damages.  See Adams v. Congress Auto Ins. Agency, Inc., 65 N.E.3d 1229, 1234 (Mass. 2016).  In the landlord-tenant context, a landlord's violation of safety statutes, regulations, or codes does not, alone, give rise to a cause of action but can constitute evidence of negligence.  See Lindsey v. Massios, 360 N.E.2d 631, 634 (Mass. 1977) ("[V]iolation of a safety statute constitutes evidence of negligence . . . .); Crowell v. MacCaffrey, 386 N.E.2d 1256, 1259 (Mass. 1979) ("[V]iolation of a statute or building code provision related to safety [is] evidence of the landlord's negligence."); Speleos v. BAC Home Loans Servicing, L.P., 755 F. Supp. 2d 304, 311 (D. Mass. 2010) ("A claim for negligence based on a statutory or regulatory violation can survive even where there is no private cause of action under that statute or regulation.").

Here, Plaintiffs have made out a plausible negligence claim.  As to the first element, they have adequately pleaded that TGM owed them a duty of care by way of the landlord-tenant relationship, see [Compl. ¶ 111], the existence of which TGM does not dispute.[18]  As to the

---

[18] TGM argues that Plaintiffs' claim cannot stand because a landlord's only duty to the tenant is one of warranty.  [ECF No. 26 at 12].  It also asserts that Plaintiffs failed to properly plead that TGM owed them a duty of reasonable care, noting that Count III "only pleads a breach of the 'minimum standards of fitness for human habitation' under statutes and codes."  [Id.].  The Court finds both arguments unpersuasive.  First, Massachusetts courts have held that, separate from the implied warranty of habitability, landlords owe tenants a general duty of reasonable care.  See Young v. Garwacki, 402 N.E.2d 1045, 1050–51 (Mass. 1980) (holding that "[t]he landlord is liable [to the tenant] in negligence for defects of which he has notice"); Roderick v. Brandy Hill Co., 631 N.E.2d 559, 560 (Mass. App. Ct. 1994) (holding in an action brought by tenants that "[a] residential landlord owes a duty to maintain its property in a reasonably safe condition in view of all the circumstances" and that "[he] cannot be held liable in negligence unless he knew or reasonably should have known of the defect and had a reasonable opportunity to repair or remove it" (emphasis added)).  Second, because Plaintiffs have adequately alleged a landlord-tenant relationship, and Massachusetts law requires landlords to act with reasonable

second and third elements (breach and causation), Plaintiffs have alleged that TGM breached its

duty by failing to properly maintain the sewage system which led to the flood in the Apartment.

[Id. ¶¶ 112–13].[19]  As to the fourth element (damages), Plaintiffs have pleaded multiple facts that

point to property damage to both the Apartment and their belongings.  See, e.g., [Compl.

¶¶ 70–72, 85–86, 88 (alleging various facts relating to the damage to Plaintiffs' clothing and

efforts to have it dry-cleaned); id. ¶ 77 (alleging that all of the apartment's contents were

contaminated with raw sewage); id. ¶¶ 78, 80 (alleging that items of value were missing or

disposed of without their consent when TGM's agents entered the apartment after the flood); id.

¶¶ 90–92 (alleging that they provided TGM with an itemized list of their damages after the

flood)].

In sum, Plaintiffs have met the plausibility threshold under Rule 12(b)(6) with respect to

each element of their negligence claim.  TGM's motion as to Count III, [ECF No. 19], is

therefore DENIED.

### F.    Counts V and VI: Emotional Distress Claims

In Counts V and VI, Plaintiffs bring claims for negligent infliction of emotional distress

("NIED") and intentional infliction of emotional distress ("IIED"), respectively.  [Compl.

---

care, the fact that Plaintiffs did not include the words "duty of reasonable care" in their
complaint is immaterial.

[19] TGM argues that because of the way the complaint is worded, Plaintiffs did not properly assert
a common law negligence claim.  It contends that Plaintiffs instead attempted to assert express or
implied rights of action under the cited statutes and regulations, and such rights of action do not
exist.  See [ECF No. 20 at 24–26].  Plaintiffs respond that the fact that they cited to various
applicable regulations does not mean that they are asserting rights of action under those
regulations, because it is well-established that "violations of health and safety codes/ordinances,
while not negligence per se, can constitute evidence of negligence."  [ECF No. 23 ¶ 72].
Because Plaintiffs are correct that such violations can constitute evidence of negligence, the
Court finds TGM's argument about the semantics of Count III unpersuasive.

¶¶ 122–30].  In broad strokes, they allege that TGM caused them emotional distress by failing to properly maintain the Apartment, failing to inspect and to obtain occupancy permits before leasing the Apartment to Plaintiffs, by breaking its promise to pay for the cost of dry cleaning Plaintiffs' clothes, and proposing a new lease with a waiver of liability.  [Id. ¶¶ 124 (NIED claim), 128 (IIED claim)].

To state a claim for NIED,

> a plaintiff must allege that (1) the defendant was negligent; (2) that she suffered emotional distress as a result of the defendant's negligence; (3) the emotional distress was caused by the defendant's negligence; (4) the plaintiff suffered physical harm manifested by objective symptomatology; and (5) a reasonable person would have suffered emotional distress under the same circumstances.

Gouin v. Gouin, 249 F. Supp. 2d 62, 74 (D. Mass. 2003) (citing Payton v. Abbott Labs, 437 N.E.2d 171, 181 (Mass. 1982)).  The scope of the "physical harm" element has been widened since its inception.  Rather than requiring a showing of actual physical injury, Massachusetts courts have held that "plaintiffs must corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial."  Sullivan v. Bos. Gas Co., 605 N.E.2d 805, 810 (Mass. 1993).  In other words, plaintiffs must show more than "mere upset, dismay, humiliation, grief [or] anger."  Id. (quoting Corso v. Merrill, 406 A.2d 300, 304 (N.H. 1979)).

To plead IIED, a plaintiff must allege facts suggesting:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

Gouin, 249 F. Supp. 2d at 73 (citations and internal quotation marks omitted).  As opposed to

NIED, there is no "physical harm" requirement with an IIED claim.  Cady v. Marcella, 729

N.E.2d 1125, 1131 (Mass. App. Ct. 2000).  Similar to NIED, however, plaintiffs must allege

conduct that goes beyond "mere insults, indignities, threats, [or] annoyances."  Gouin, 249 F.

Supp. 2d at 73 (quoting Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1194

(Mass. 1997)).

      While the analyses of NIED and IIED claims often diverge due to their differing

elements, both of Plaintiffs' claims here fail on essentially the same point.  Plaintiffs state only

that they have suffered from "extreme discomfort mentally [and] physically," [Compl. ¶ 125

(NIED)], and that the distress they suffered was "severe and of a nature that no reasonable man

could be expected to endure it," [id. ¶ 130 (IIED)].  In each instance, this is merely a "formulaic

recitation of the elements," without any supporting factual content.  Iqbal, 556 U.S. at 678

(quoting Twombly, 550 U.S. at 555).  The Court need not credit such recitations when evaluating

the sufficiency of a complaint.  A.G. ex rel Maddox, 732 F.3d at 80; see Hindle v. Toyota Motor

Credit Corp., No. 18-cv-11306, 2018 WL 6033484, at *4 (D. Mass. Nov. 16, 2018) (rejecting

plaintiffs' allegation that they experienced "a great deal of stress and anxiety" that "manifested

itself in physical symptoms" as a formulaic recitation of the physical harm element of NIED);

Polay v. McMahon, 10 N.E.3d 1122, 1130 (Mass. 2014) (discounting plaintiffs' allegation that

"the emotional distress suffered . . . was severe and of such a nature that no reasonable person

could be expected to endure it" as a formulaic recitation of the severity element of IIED).  The

only factual allegation that can be read to support Plaintiffs' emotional distress claims is that

Plaintiffs told Ms. Landquist that "they [were] very distressed by the situation and the extreme

impact it is having on them."  [Compl. ¶ 69].  This allegation, however, does not lend objective

support to either of Plaintiffs' emotional distress claims.  It is subjective and, at most, evidences "mere upset," which is insufficient on its own.  Sullivan, 605 N.E. 2d at 810 (quoting Corso, 406 A.2d at 304).

Because Plaintiffs have failed to plead facts to support their claims of emotional distress, TGM's motion as to Counts V and VI, [ECF No. 19], is GRANTED with leave to amend.

### G.    Count IX: Invasion of Privacy

In Count IX, [Compl. ¶¶ 140–43], Plaintiffs bring an invasion of privacy claim under the Massachusetts' privacy statute, which states that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy" and provides a private right of action for violations.  Mass. Gen. Laws ch. 214, § 1B.  Plaintiffs allege that after entering the Apartment to address the sewage flood, TGM "ransacked through drawers," pooled all their belongings together, and lost, destroyed, or stole various valuable items.  [Compl. ¶¶ 77–78, 80, 142].  TGM argues that Massachusetts courts have interpreted the privacy statute to only "protect[] people from disclosure of facts that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest," and that Plaintiffs have failed to plead the essential element of dissemination.  [ECF No. 20 at 30 (quoting Bratt v. Int'l Bus. Machs. Corp., 467 N.E.2d 126, 133–34 (Mass. 1984))].  While TGM is incorrect that public disclosure of private facts is the only definitively actionable privacy tort in Massachusetts, for the reasons set forth below, the Court nonetheless finds that Plaintiffs have failed to state a claim.

 "Massachusetts has never recognized a common-law cause of action for invasion of privacy," Spencer v. Roche, 755 F. Supp. 2d 250, 271 (Mass. 2010), but "recognizes an actionable right of privacy" under the privacy statute, Dasey v. Anderson, 304 F.3d 148, 153 (1st Cir. 2002).  "[T]he Legislature appears to have framed the statute in broad terms so that the

27

courts can develop the law thereunder on a case-by-case basis . . . ."  <u>Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 567 N.E.2d 912, 915 (Mass. 1991) (citing <u>Bratt</u>, 467 N.E.2d at 135).  Although it is not fully settled which theories are actionable under the privacy statute,[20] the public disclosure of private facts is explicitly recognized as a viable cause of action and intrusion upon seclusion appears to be at least impliedly recognized.  <u>See</u> <u>Polay</u>, 10 N.E.3d at 1126 ("Most of our jurisprudence under [the privacy] statute has involved public disclosure of private facts, but a plaintiff also may support a claim of invasion of privacy by showing that a defendant has intruded unreasonably upon the plaintiff's 'solitude' or 'seclusion.'").

It is not clear from the face of the complaint which invasion of privacy theory Plaintiffs advance.  Count IX cites the privacy statute, and alleges that the invasion of privacy occurred when Plaintiffs' belongings were moved, stolen, or destroyed "[a]s a result of Defendant(s) and its agents negligence and actions during the catastrophic sewage flooding."  [Compl. ¶ 142].  In their briefings on the instant motion, however, Plaintiffs attempt to make out an intrusion upon seclusion claim.  <u>See</u> [ECF No. 23 ¶¶ 105–06].  Even reading the complaint as broadly as reasonably possible, the allegations regarding TGM's treatment of Plaintiffs' personal items do not logically connect to a theory of intrusion upon seclusion.  Intrusion upon seclusion typically involves unwanted surveillance or other physical invasions, <u>Polay</u>, 10 N.E.3d at 1127, unwanted contact constituting harassment, <u>Schlesinger</u>, 567 N.E.2d at 914–15, or bodily intrusions such as drug testing, <u>Delmonte v. Laidlaw Env. Servs., Inc.</u>, 46 F. Supp. 2d 89, 97 (D. Mass. 1999).  This is not to say that these are the only factual scenarios that could support a claim for intrusion upon

---

[20] Historically, American courts have recognized four invasion of privacy torts: (1) casting another in a false light; (2) appropriation of another's name or likeness; (3) intrusion upon seclusion; and (4) public disclosure of private facts.  <u>See</u> Restatement (Second) of Torts § 652A (1977).

seclusion, but Plaintiffs' allegations regarding the fate of personal belongings simply do not make out an intrusion claim under the recognized meaning of the tort.[21]

Further, Plaintiffs' allegations do not support a "public disclosure of private facts" claim because, although some of the items that Plaintiffs allege went missing likely contained private facts (e.g., a green card), Plaintiffs do not allege any dissemination.  Therefore, to the extent that the complaint can be read to assert this theory, the claim fails as a matter of law.  See Koppel v. Moses, 20-cv-11479, 2020 WL 6292871, at *9 (D. Mass. 2020).

In sum, because Plaintiffs have not pleaded facts that support a legally cognizable claim for invasion of privacy, TGM's motion as to Count IX, [ECF No. 19], is GRANTED.

## IV.     CONCLUSION

Accordingly, for the reasons set forth above, TGM's motion for judgment on the pleadings, [ECF No. 19], is GRANTED in part and DENIED in part.  Counts V (NIED), VI (IIED), IX (Invasion of Privacy), and XVIII (Chapter 93A based on § 3.16) are dismissed.  With respect to Counts V and VI only, Plaintiffs may amend their complaint within twenty-one days.

**SO ORDERED.**

February 22, 2021                                             /s/ Allison D. Burroughs
                                                             ALLISON D. BURROUGHS
                                                             U.S. DISTRICT JUDGE

---

[21] To the extent Plaintiffs allege that the entry into their apartment after the flood constituted an unreasonable physical intrusion—which, again, is not clear from the face of the complaint—that is also not a plausible theory.  "Not every intrusion will constitute a legally cognizable violation of privacy," Schlesinger, 567 N.E.2d at 915, because the plaintiffs must show that the intrusion was "unreasonable, substantial or serious," Mass. Gen. Laws ch. 214, § 1B.  As Plaintiffs concede, see [ECF No. 29 ¶ 84], TGM and its agents had the right to enter the Apartment after the sewage flood to address the emergency.  Plaintiffs have not alleged that they did not consent to this entry, or that the entry was in any other way an "unreasonable, substantial or serious" intrusion.  Mass. Gen. Laws ch. 214, § 1B.